IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARKUS TRUVELL YEARBY,

    Plaintiff,                    No. 2:07-cv-02800 KJN P

    vs.

CALIFORNIA DEPARTMENT OF
CORRECTIONS, et al.,

    Defendants.             <u>ORDER</u>

                     /

        Plaintiff Markus Yearby is a former state prisoner, who proceeds without counsel and in forma pauperis, in this civil rights action filed pursuant to 42 U.S.C. § 1983. This action proceeds pursuant to the authority of the undersigned magistrate judge for all purposes. See 28 U.S.C. § 636(c); Local Rule 305(a). The case proceeds on plaintiff's Fourth Amended Complaint (Dkt. No. 59), against sole defendant, Gillian Dudley, a Physician's Assistant at High Desert State Prison ("HDSP"). Pending is defendant's motion for summary judgment. (Dkt. No. 110.) Plaintiff filed an opposition (Dkt. No. 112);[1] defendant filed a reply (Dkt. No. 113). For

---

[1] Plaintiff's opposition was untimely filed. The motion for summary judgment was served on plaintiff by mail, on July 6, 2011. (Dkt. No. 110 at 3.) Pursuant to Local Rule 230(l), "[o]pposition, if any, to the granting of the motion shall be served and filed by the responding

1

the reasons that follow, the court grants defendant's motion for summary judgment.

I. <u>Introduction</u>

Pursuant to his Fourth Amended Complaint ("complaint"), plaintiff alleges that defendant Dudley, while working as a Physician's Assistant ("PA") at HDSP, was deliberately indifferent to plaintiff's serious medical needs concerning his right shoulder condition. Plaintiff alleges that, as a result and for a period of 27 days, he was subjected to significant pain and suffering, and difficulties in executing day-to-day activities,[2] particularly difficulty in showering because he was unable to comply with the requirement of HDSP's Administrative Segregation Unit ("ASU") that inmates be cuffed behind the back. Plaintiff designates the end of this 27-day period as November 13, 2007, when he received medical attention for his right shoulder. However, plaintiff also contends that he has had "long term" consequences extending "to the present day."[3] (Yearby Depo. at 12, 42, 45.)

The complaint also alleges that defendant acted in retaliation against plaintiff for exercising the right to challenge the quality of his medical care pursuant to the administrative

---

party not more than twenty-one (21) days after the date of service of the motion." Allowing three additional days after service of defendant's motion, <u>see</u> Fed. R. Civ. P. 6(d), the deadline for plaintiff to file and serve his opposition was Monday, July 30, 2007. Therefore, plaintiff's opposition, signed on August 5, 2007, was untimely. Nevertheless, because the court favors addressing substantive matters on the merits, the court has considered the substance of plaintiff's opposition.

[2] In his deposition, plaintiff explained that "from 10-17 to 11-13 . . . I was not able to take a shower . . . . I couldn't brush my teeth and eat like I usually do because I'm right-handed . . . . I could use my left hand . . . but that created a lot of different problems with dropping food, . . . gouging my gum with my toothbrush. . . ., getting dressed and taking showers was out of the case (sic). . . ." (Yearby Depo. at 42.)

[3] Plaintiff explained at his deposition that his alleged interactions with defendant "created . . . some long term mental and emotional suffering. The fact that I have to sit here . . . in this room and, you know, take a deposition, you know, is time I could be spending doing something else. The time that I've spent reading all these legal cases and filing all these motions or whatever and, you know, filing the complaints and amended complaints and this and that, you know, and the hostility that I've suffered from the custody staff that see the paperwork that comes in that says that, you know, that I have a lawsuit against the CDC. You know, that has created a hostile living environment as well." (Yearby Depo. at 45.)

2

grievance process.

Pursuant to these allegations, as previously narrowed by the court (see findings and recommendations filed July 21, 2010, adopted on September 22, 2010 (Dkt. Nos. 97, 100)), this action proceeds on plaintiff's legal claims that defendant was deliberately indifferent to plaintiff's serious medical needs, in violation of the Eighth Amendment to the United States Constitution; that defendant was negligent under a state tort (medical malpractice) theory; and that defendant retaliated against plaintiff in violation of the First Amendment to the United States Constitution.

II. Legal Standards for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56(c) is met. "The judgment sought should be rendered if . . . there is no genuine issue as to any material fact, and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Federal Rule of Civil Procedure 56(c). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such a circumstance, summary judgment should be granted, "so

long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809 F.2d at 631.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e), Advisory Committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56 (c). The evidence of the opposing party is to be believed. Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court

must be drawn in favor of the opposing party. <u>Matsushita</u>, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 586 (citation omitted).

On May 7, 2008, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 17.) See <u>Rand v. Rowland</u>, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), <u>cert</u>. <u>denied</u>, 527 U.S. 1035 (1999), and <u>Klingele v. Eikenberry</u>, 849 F.2d 409, 411-12 (9th Cir. 1988).

III.  Undisputed and Disputed Facts

Unless otherwise noted, the following facts are undisputed by the parties, or deemed undisputed pursuant to the court's review of the record.

1. On September 10, 2007, plaintiff Markus Yearby was placed in HDSP's ASU.

2. Defendant Gillian Dudley, a Physician's Assistant, treated Yearby twice during his incarceration at HDSP.

3. Defendant first saw plaintiff for a cut to his right hand, on September 10, 2007. Defendant cleaned and bandaged plaintiff's hand wound, and prescribed a tetanus shot, penicillin, and pain medication. Plaintiff does not challenge defendant's quality of care on this date.

4. Defendant next saw plaintiff on October 17, 2007; plaintiff challenges the quality of defendant's care on this date only.

5. Between September 10, 2007, and October 17, 2007, plaintiff submitted several "Health Care Request Forms" (CDC 7362); only one, submitted October 1, 2007, complained of shoulder pain:

   a.  On September 13, 2007, plaintiff requested refills for "prescriptions of

////

1                           Methocardonal/Tylenol and prylosec." (Dkt. No. 110-8 at 23.)[4]

2       b.   On September 14, 2007, plaintiff requested access to his "previous prescription of Aprodine . . . for my chronic sinus condition." (Id. at 24.)

3       c.   On September 17, 2007, plaintiff requested assistance for his "problem with medication." (Id. at 25.)

4       d.   Also on September 17, 2007, plaintiff requested access to his prescriptions for "Methocardenol, Tylenol and Omoprezol." (Id. at 27.)

5       e.   On September 20, 2007, plaintiff requested medical attention for "sever[e] pain and burning in my stomach due to acid reflux and indigestion and I have been prescribed Omeprozol in the past but the C/Os took my meds." (Id. at 29.)

6       f.   Also on September 20, 2007, plaintiff sought the following medical assistance: "I am having a great deal of pain in my lower and middle back area. I was prescribed Methocarbenal and Tylenol for this but the staff will not allow me access to my medication." (Id. at 30.)

*Plaintiff was seen by Registered Nurse ("RN") Punt on September 20, 2007, for the above complaints. (Id. at 24-26.)*

        g.   On September 24, 2007, plaintiff stated: "I am still trying to get the medication previously prescribed me . . . I am in severe pain." (Neither the requested medication nor the site of the pain were identified.) (Id. at 32.)

        h.   Also on September 24, 2007, plaintiff complained: "I saw Dr. Roche last week and he had I thought prescribed some Nasenex for the problem with my throat. I have received nothing. . . . I am continuing to have the problems with my throat and congestion and clearing (pain). (Id. at 33.)

*Plaintiff was seen by RN Punt on September 28, 2007, for the above complaints. (Id. at 33.)*

        i.   On September 27, 2007, plaintiff stated: "I am itching all over my body and am breaking out with bumps. . . . I have been prescribed selenium sulfate in the past for this type of problem. Please see me." (Id. at 34.)

        j.   On October 1, 2007, plaintiff complained, for the first time, of shoulder pain: "I am having a lot of pain in my right shoulder, stemming from a torn rotator cup (sic) in the past. All the cuffing behind the back seems to be hyperextending it and my arm is become hard to move and operate. Please see me." (Dkt. No. 110-8 at 35.)

*Plaintiff was seen by RN Punt on October 3, 2007, for both of these*

---

[4] References to filed documents reflect the court's electronic pagination.

|   |   |
|---|---|
|   | *matters. Relative to plaintiff's complaints of shoulder pain, Punt noted plaintiff's statement, "I have Motrin in my cell. I need a chrono for waist chains." (Id.) Punt noted that plaintiff complained of "cuffing behind back -- reinjures R shoulder." (Id.) Punt authorized a "routine" follow-up appointment, within 14 days, with the "MD D Clinic," to include consideration for a waist-chain chrono. (Id.)* |
| k. | On October 2, 2007, plaintiff complained of "continuing complications and pain in my throat due to congestion. . . ." (Id. at 36.) |
|   | *Plaintiff was seen by RN Punt on October 3, 2007, for the above complaints. (Id. at 34-37.)* |
| l. | On October 7, 2007, plaintiff complained of continued itching. (Id. at 38.) |
|   | *Plaintiff was seen by RN Punt on October 10, 2007, for this complaint. (Id.)* |
| m. | On October 9, 2007, plaintiff complained of "continuing . . . pain in my stomach, throat and chest. The congestion in my chest and throat is getting worse. I was supposed to have a Dr's Appt on the 7th of Oct but I was never called, would you please see me. (Id. at 39.) |
|   | *Plaintiff was seen by RN Punt on October 12, 2007, for this complaint. (Id. at 39-41.)* |

6. On October 10, 2007, plaintiff submitted an administrative grievance ("appeal" or "602") (Log No. HDSP-S-07-03446), challenging the failure of medical personnel to monitor, through periodic blood tests, plaintiff's tolerance of the medication "Tegratol," and to provide plaintiff with a prescription for Nazonex to treat plaintiff's "chronic sinus problem." (Dkt. No. 110-7 at 2, 4.) Plaintiff sought the following : "I would like my blood tests to be completed on a regular schedual (sic) or my medication changed. I would also like the problems that I am having with pain in my stomach, chest, throat all ad[d]ress[ed] in a professional manner with intent on finding a solution to the problems." (Id. at 2.) This grievance contains no reference to plaintiff's shoulder condition.

7. On October 17, 2007, plaintiff was seen by defendant Dudley. The parties dispute the purpose of this appointment:

   a. Plaintiff contends that this appointment was for the purpose of assessing his right shoulder pain, but acknowledges that he also had outstanding numerous other medical requests, and a pending, unrelated, administrative grievance.

   b. Defendant contends that she saw plaintiff on this date for the purpose of interviewing him pursuant to his pending administrative grievance, concerning plaintiff's complaints of stomach, chest, and throat pain, and requested blood work.

8. The parties also dispute defendant's response to plaintiff's alleged complaints of

7

shoulder pain on October 17, 2007:

    a. Plaintiff contends that he complained of right shoulder pain, but that defendant "ignore[d] plaintiff's complaint of pain and did not triage plaintiff's shoulder condition. Defendant did not even get out of her chair to render any care to the plaintiff whatsoever."[5] (Dkt. No. 112-2 at 2.)

    b. Defendant states that she does not recall the events of October 17, 2007, but that it was her custom and practice to triage a new complaint, not contained in an inmate's pending administrative grievance, to determine whether it presented an urgent condition; defendant states that her review of plaintiff's medical records for this date indicate that plaintiff's shoulder condition did not present an urgent condition. (Dkt. No. 110-3 at 2-3.)

9. On October 17, 2007, defendant prescribed plaintiff allergy medication and a nasal spray, and authorized a return appointment within two weeks. (Dkt. No. 110-8 at 45.) Although a blood test was taken on October 16, 2007, the results were not available at the time of this visit. (Id. at 42-43.) Hence, plaintiff was unable to address plaintiff's complaint of stomach pain. (Dkt. No. 110-1 at 8.)

10. On October 18, 2007, plaintiff submitted a second administrative grievance (Log No. HDSP-S-07-03931), challenging defendant's emphasis on plaintiff's first appeal, without providing plaintiff adequate medical care. (Dkt. No. 59 at 17-20.) Plaintiff stated that "[t]he 602 business took priority and all the other issues for which I had originally been schedualed (sic) were casually glossed over and paid

---

[5] At his deposition, plaintiff recounted his October 17, 2007 encounter with defendant as follows. Plaintiff stated that, on October 16, 2007, he "was issued a priority medical [ducat] to attend a medical appointment on October 17th," and on that date was "called to the doctor's line to attend that medical appointment," when he was seen by defendant Dudley. (Yearby Depo. at 12-13.) While acknowledging that defendant addressed plaintiff's pending administrative grievance, plaintiff recalls that he "made [defendant] . . . aware that I have a problem with my right shoulder and that it is producing a great deal of extreme pain and that being in that administrative segregation unit, all the requirements of being handcuffed behind my back during movement was aggravating the situation and was an unbearable requirement for me to have to adhere to." (Id. at 13.) Plaintiff stated that defendant responded as follows (id. at 13-14):

    Really she just shook her head and, you know, kind of brushed it off . . . . I think she might have said, "you will have to be evaluated for that," or something to that extent. . . . I understood her body language, her statement, and everything that was happening at that time, . . . to mean the appointment or the consultation, whatever you want to call it, was over with and that she was pretty much done providing whatever care, assistance that, you know, was going to be given that day.

Asked if plaintiff interpreted defendant's statement to mean that "you had to go and get a physical evaluation and consultation," plaintiff responded, "that could be interpreted that way, absolutely." (Id. at 14.) Plaintiff stated that, as he was being escorted out of the medical office, he told defendant that "it was her obligation to provide me medical care and that it was against the law for her to deny me medical care for this issue . . . ." (Id. at 16.)

little to no attention. One of these issues is the problem that I am having with my shoulder. . . . I would like the issue of my shoulder and the other three issues (i.e. throat, skin, chest) for which I was originally schedualed to be addressed . . . ." (Id. at 17.) Plaintiff stated that he has had right shoulder symptoms since sustaining a sports injury in 1985, and reinjury in 1992. (Id. at 19.)

    a. The grievance was "granted" at the Informal Level Review, on November 19, 2007, on the ground that plaintiff was "currently scheduled to be seen by the primary care provider on the MD line." (Id. at 17.)

    b. Plaintiff nonetheless sought First Level Review, and requested that his complaints against defendant be considered a staff complaint. (Id. at 17, 20.) The grievance was again granted at the First Level Review, without comment. (Id. at 18.)

11. Meanwhile, on November 7, 2007, plaintiff submitted a Health Services Request Form seeking treatment for his shoulder pain. (Dkt. No. 110-8 at 50.) Plaintiff stated as follows: "I am in severe pain due to my shoulder injury. I have limited movement in my arm and pain that lasts all through the day. I am not able to go to showers because I can't cuff behind my back. Would you please see me. For my appointment would you please request the escort to use waist chains. I can't use cuffs behind back." (Id.)

    a. Plaintiff was seen by an RN (name unclear) on November 8, 2007, who noted that, "Inmate seems to be in genuine distress and pain and was concured by cell mate that eating and movement is extremely difficult and painful w/ ADLS [activities of daily living] disrupted. (Id.) The RN ordered a "routine" follow-up appointment with an MD, within fourteen days, without further nurse triage, and noted plaintiff's request for a waist-chain chrono. (Id.)

    b. Plaintiff was examined by Dr. Waterman on November 13, 2007, who diagnosed, in pertinent part, right frozen shoulder. Dr. Waterman ordered a chrono for waist chains, and a low bunk on the bottom tier; a prescription for Tylenol #3; an x-ray of plaintiff's shoulder; and physical therapy. (Id. at 51-55.)

    c. Dr. Waterman again saw plaintiff on December 4, 2007. He noted that plaintiff had not received the x-ray or physical therapy, and again ordered the x-ray, which was taken on December 11, 2007. (Id. at 66-68, 70-71.)

12. Subsequent treatment of plaintiff's right shoulder revealed the following: X-rays taken on December 11, 2007, and January 18, 2008, showed that plaintiff's right shoulder had minimal calcific tendinosis; an MRI performed on February 6, 2008, showed a partial rotator cuff tear (Dkt. No. 110-8 at 82); in September 10, 2008, plaintiff was seen by an orthopedic surgeon, who recommended that plaintiff undergo an arthroscopy of the right shoulder to treat his partial rotator cuff tear (Dkt. No. 110-8 at 85); plaintiff was scheduled for surgery in February 2009, but he refused to attend his scheduled appointment, stating that he "need[ed] to talk with medical staff to ensure that I will be able to get around. Need to reschedu[le]." (Dkt. No. 110-8 at 87.)

1    13.    From September 30, 2007, until December 28, 2007 (when plaintiff was transferred to California State Prison-Corcoran), plaintiff did not refuse to shower while in the ASU.  Plaintiff agrees with this statement, but disputes its relevance. Plaintiff contends that he "was disallowed numerous showers due to his inability to cuff behind his back.  There were other occasions where Custody Staff showed plaintiff compassion and used waist restraints or double cuffs to allow plaintiff the opportunity to shower." (Dkt. No. 112-2 at 3.)

IV.   Discussion

    A.   Deliberate Indifference

        1.   Legal Standards

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). To prevail on the claim, plaintiff must show:  (1) that his medical needs were objectively serious; and (2) that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand from Supreme Court).  The requisite state of mind is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Indications that a prisoner has a serious need for medical treatment are the following:  the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g. Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled in part on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference."

Negligence is insufficient. Farmer, 511 U.S. at 835. Even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37. Similarly, it is not sufficient to establish that a reasonable person would have known of the risk, or that a defendant should have known of the risk, in the absence of treatment. Id. at 842.

It is nothing less than recklessness in the criminal sense that is required, that is, disregard of a risk of harm of which the actor is actually aware. Farmer, 511 U.S. at 838-42. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42. However, obviousness per se will not impart knowledge as a matter of law. Nevertheless, a physician need not fail to treat an inmate altogether in order to violate the inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure competently to treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985). Of note, although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-40 (9th Cir. 1990), and Hudson, 503 U.S. at 4-6. A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry. McGuckin, 974 F.2d at 1060. In summary, "the more serious the medical needs of the

11

prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." Id. at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, or lack thereof, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference. Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988). Thus, although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received equated with deliberate indifference, thereby creating a material issue of fact, summary judgment should be entered for the defendant. The dispositive question on this summary judgment motion is ultimately not what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

Also significant to the analysis is the well-established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

In order to defeat defendants' motion for summary judgment, plaintiff must "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to plaintiff's health," Jackson, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

2. Analysis of Eighth Amendment Claim

The parties dispute whether plaintiff's right shoulder condition, when plaintiff was interviewed by defendant on October 17, 2007, was a "serious medical need" within the meaning of the Eighth Amendment. Plaintiff contends that his condition was "very serious because the pain was excruciating," and "greatly affected his ability to perform routine daily activities."

(Dkt. No. 112-1 at 6.)  Moreover, asserts plaintiff, the seriousness of his condition was documented by medical personnel both before and after plaintiff was seen by defendant on October 17, 2007.  (Dkt. No. 112-1 at 3.)

Defendant contends, on the other hand, that plaintiff's shoulder condition on October 17, 2007, did not present a "serious medical need."  Significantly, however, defendant has "no independent recollection of the events of 2007," and thus "do[es] not recall Yearby complaining about his shoulder."  (Dudley Decl., Dkt. No. 110-3 at 2.)  Nevertheless, defendant states that it was her custom and  practice to assess the urgency of a matter raised in an appeal interview that was not contained in the prisoner's grievance.  If defendant determined that it "was an urgent matter that required immediate medical attention," then defendant "addressed and treated the condition."  (Id.)  However, if defendant determined that the condition "was not an urgent matter, I either advised the inmate to submit a request for medical treatment or I ordered that the inmate be scheduled for an appointment."  (Id.)  Defendant states that if plaintiff complained of shoulder pain on October 17, 2007, then defendant "would have triaged his shoulder condition to determine if his pain presented an urgent condition."  (Id. at 3.)  Defendant states, "[b]ased on my review of the medical records, Yearby's complaint of shoulder pain was not an urgent matter.  He was already receiving pain medication and another provider had already treated him for shoulder pain."  (Id.)

The available record indicates that, while plaintiff's shoulder condition was likely causing him pain, particularly when plaintiff was required to cuff behind his back, plaintiff's apparent lack of treatment on October 17, 2007 did not pose a substantial risk of serious harm.  The MRI taken in January 2008 showed that plaintiff had a partial rotator cuff tear, which likely caused plaintiff's pain and mobility problems in October 2007.  However, plaintiff's rejection of arthroscopic surgery to repair the tear in February 2009 indicates that, on balance, plaintiff's pain and alleged mobility problems were not as severe in October 2007 as he now alleges.  On October 3, 2007, two weeks prior to defendant's interview of plaintiff, Nurse Punt examined

13

1  plaintiff's shoulder and determined that the condition required only a "routinely" scheduled
2  follow-up medical appointment.  Plaintiff stated to Nurse Punt that his primary concern was to
3  obtain a waist chain chrono, rather than additional pain medication.  Similarly, plaintiff stated in
4  deposition that he would have been satisfied if defendant had merely provided a waist-chain
5  chrono on October 17, 2007.  (Yearby Depo. at 43-4.)  These statements imply that plaintiff's
6  principal concern was functional rather than medical.  (Yet, even without the waist-chain chrono,
7  plaintiff concedes that, on occasion, he was provided waist chains or was double cuffed in order
8  to shower.  (Dkt. No. 112-2 at 3.))

9  It was not until after plaintiff's appointment with defendant that plaintiff focused
10 on his complaints of shoulder pain.  The day after seeing defendant plaintiff filed an
11 administrative grievance challenging defendant's care of plaintiff's shoulder, as well as
12 plaintiff's throat, skin and chest conditions.  Not receiving an immediate response, plaintiff
13 submitted a Health Care Services Request on November 7, 2007, dedicated to seeking treatment
14 for his shoulder.  Plaintiff's complaints of pain and functional restrictions were sufficiently
15 compelling that plaintiff was seen the next day, on November 8, 2007.  Later, asked whether he
16 knew, "on October 17, 2007, that you could submit the request for medical services indicating
17 that you were having great pain and that you could be seen within one day for an evaluation,"
18 plaintiff responded, "Absolutely, yeah." (Yearby Depo. at 24-25.)  However, plaintiff stated that
19 he thought he would see a doctor, rather than a registered nurse, faster through the grievance
20 process, a perception supported by the alleged fact that the nurse practitioner, on November 8,
21 2007, had plaintiff's 602 in her hand, not his 7362.  (Id. at 25-6.)

22 These several factors undermine the alleged seriousness of plaintiff's shoulder
23 condition prior to, and including, October 17, 2007.  The alleged seriousness of plaintiff's
24 shoulder condition mid-October 2007, is also diluted by plaintiff's numerous health care services
25 requests addressing other matters.  The record does not support a reasonable inference that, on
26 October 17, 2007, plaintiff's shoulder condition, left untreated, posed a substantial risk of serious

14

harm. Therefore, the court finds that plaintiff's shoulder condition was not a "serious medical need," within the meaning of the Eighth Amendment, when presented to defendant on October 17, 2007.

The court further finds that, even if plaintiff's shoulder condition was construed to be a "serious medical need" on October 17, 2007, the record does not support a finding that defendant had the requisite culpable state of mind, specifically, that defendant was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also [drew] the inference." Farmer, 511 U.S. at 837. Tasked with addressing the matters alleged in plaintiff's first administrative grievance, which did not include plaintiff's shoulder condition, defendant reasonably concentrated on the grieved matters. Moreover, given the significant number of Health Care Services Requests submitted by plaintiff, only one of which addressed his shoulder condition, it was reasonable for defendant to assume that plaintiff's shoulder condition was not as serious as the other conditions that plaintiff repeatedly reported.

It is clear that plaintiff and defendant had different expectations on October 17, 2007. Defendant reasonably approached the interview as limited to the complaints set forth in plaintiff's administrative grievance, while plaintiff reasonably assumed that, since two weeks had passed since Nurse Punt's "routine referral," that he would be receiving medical care for his shoulder, as well as his other medical conditions. While disappointing to plaintiff, his numerous challenges to the nature and purpose of defendant's interview -- e.g., that "the appeals coordinator was trying to slide a 602 in . . . at the same time as my medical appointment" (Yearby Depo. at 31-32); or that the interview was intended to "cover the screw-up" of the HDSP Chief Medical Officer (relative to plaintiff's prescription for nasal spray) (id. at 38, 40) -- fail to raise a material factual dispute.

Therefore, the court finds that, even assuming that plaintiff's shoulder condition was a "serious medical need" on October 17, 2007, plaintiff has failed to allege any facts upon which to reasonably infer that defendant deliberately failed to treat plaintiff's shoulder condition,

despite knowing that such failure created a substantial risk of serious harm. Farmer v. Brennan, supra, 511 U.S. at 837, 847. Absent any facts to support this subjective component of plaintiff's Eighth Amendment claim, the claim must fail.

In conclusion, the court finds that plaintiff has failed to allege any facts upon to find that plaintiff's shoulder condition, as presented to defendant on October 17, 2007, was a "serious medical need" within the meaning of the Eighth Amendment or, even assuming that the condition met the seriousness threshold, that defendant denied plaintiff treatment despite knowing that such omission created a substantial risk of serious harm.

For these reasons, summary judgment is granted for defendant on plaintiff's Eighth Amendment claim.

B. Retaliation

In support of plaintiff's First Amendment retaliation claim, the complaint alleges that defendant acted "purposely and maliciously . . . as a means of punitive measure and retaliation for plaintiff exercising his right to the Appeals Process (Appeal Log HDSP S-07-03446);" that, "after reading the information of the Inmate Appeal . . . [,] which detailed events of shoddy medical practices . . . [defendant acted with] bias toward the plaintiff;" that defendant's challenged conduct was a "[p]unitive measure in retaliation for exercising the Law of Administrative Remedy[,] . . . the reason why plaintiff was denied medical care." (Dkt. No. 59 at 3-4.) The complaint also alleges that defendant "harbored a bias attitude toward the plaintiff stem[m]ing from a previous encounter on 9/10/2007 in which plaintiff admonished the defendant for not applying sutures to a laceration on plaintiff's hand." (Id. at 4.)

To prevail on a claim for retaliation under the First Amendment, a prisoner must allege sufficient facts from which a reasonable inference may be drawn that the defendant, acting under state law, took an adverse action against plaintiff in retaliation for plaintiff engaging in a constitutionally protected activity, and that the adverse action did not reasonably advance a legitimate penological objective. Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005);

Rizzo v. Dawson, 778 F.2d 527, 531-32 (9th Cir. 1985).  Direct and tangible harm will support a First Amendment retaliation claim even without demonstration of a chilling effect on the further exercise of a prisoner's First Amendment rights.  Rhodes, at 568 n.11.  "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a retaliatory adverse action.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009), citing Rhodes, 408 F.3d at 568, n.11.

Plaintiff has presented no evidence in support of his retaliation claim.  At his deposition, plaintiff testified only that he believed defendant took offense, and reacted, to plaintiff's pending appeal, even though defendant wasn't named in it.  Plaintiff stated, "I believe that the reasons that she acted the way that she did, and I can't -- I don't have absolute proof of this, but I believe the reason that she acted the way that she did is because of the verbiage that is contained in this 602.  She read the 602 and based on what it says, she became emotionally affected.  I say this because her whole attitude during the entire consultation was that -- was not that of a medical professional.  Her attitude during this entire consultation was that of an individual scorned." (Yearby Depo. at 45-46.)  Asked if he has "any actual evidence that [defendant] was retaliating against you because of that 602?" plaintiff responded, "I told you this is all I have." (Id. at 47.)

Consistently, in his opposition to the motion for summary judgment, plaintiff stated only that "the contrast between defendant's actions of September 10, 2007 (treatment of hand injury) and October 17, 2007 (failure to offer treatment for injury) is evidence enough to show the difference in the defendant's state of mind." (Dkt. No. 112-2 at 3-4.)  Plaintiff's conjectures fail to provide evidentiary support for his retaliation claim.

Therefore, summary judgment is granted for defendant on plaintiff's First Amendment retaliation claim.

    C.  State Law Negligence Claim

In addition to his federal constitutional claims, plaintiff alleges a state law claim

for medical negligence under California law.  Having resolved all claims over which this court has original jurisdiction, the undersigned declines supplemental jurisdiction over plaintiff's state law claim.  See 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction).

Therefore, plaintiff's state law claim is dismissed without prejudice.  Plaintiff may pursue this claim in state court pursuant to the time limitations set forth in 28 U.S.C. § 1367(d).

V. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Defendant's motion for summary judgment filed July 6, 2011 (Dkt. No. 110), is granted in part;

2. Summary judgment is granted for defendant on plaintiff's federal constitutional (First and Eighth Amendment) claims alleged pursuant 42 U.S.C. § 1983.

3. The court declines supplemental jurisdiction over plaintiff's state law claim, which is therefore dismissed without prejudice.

4. Judgment is entered for defendant Dudley.

DATED:  March 8, 2012

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

year2800.msj